UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

UNITED STATES OF AMERICA,

06 Cr. 358-01 (RWS)

- against -

KENNETH OLA LABBE,

SENTENCING OPINION

Defendant.

-----------------------------------------X

**Sweet, D.J.,**

On August 30, 2007, Kenneth Ola Labbe ("Labbe") pleaded guilty to one count of conspiracy to transport stolen good in interstate commerce in violation of 18 U.S.C. § 371 ("Count I"), and one count of transportation of stolen good in interstate commerce in violation of 18 U.S.C. § 2314 ("Count II"). For the reasons set forth below, Labbe will be sentenced to 57 months' imprisonment and a term of supervised release of three years. He will also be required to forfeit his interest in $44,000,000 in U.S. currency and U.S. Postal Service money orders totaling approximately $25,000, as well as a special assessment of $200.

1

**Prior Proceedings**

Labbe was arrested on April 23, 2006, and a complaint was filed against him in the Southern District of New York the following day. An indictment charging the above crimes was filed on April 24, 2006. Labbe appeared before the Court on May 9, 2006 and pleaded not guilty. On August 30, 2007, Labbe appeared before the Honorable Debra C. Freeman of this district, at which time he withdrew his not guilty plea and entered a plea of guilty to the counts charged in the indictment. On September 19, 2007, Labbe's plea was accepted by the Court. He is scheduled to be sentenced on January 29, 2008.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 125 S. Ct. 738 (2005) and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines (the "Guidelines") established by the United States Sentencing Commission. Thus, the sentence to be imposed here is the result of a consideration of:

2

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed --

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for --

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement . . . [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. See Crosby, 397 F.3d at 111.

## The Defendant

The Court adopts the facts set forth in the Probation Department's Presentence Investigation Report ("PSR") with respect to Labbe's personal and family history.

## The Offense Conduct

The following description draws on the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

From 2002 through January 2006, JP Morgan Chase Bank, a large international bank with offices located in New York, NY, operated a "lockbox" system on behalf of various corporate account holders. Using the lockbox system, an individual or entity seeking to pay one of the account holders by check would not send the check to the account holder, but rather, would mail the check directly to the bank to be credited to the account holder's account.

4

From at least 2002 through January 2006, more than approximately $100,000,000 worth of checks written by large commercial entities and mailed to the bank's lockbox were stolen before being credited to the appropriate account holders' accounts. Labbe and others, including co-conspirators Gregory Halley ("Halley") and Bernard Ellis ("Ellis"), conspired to fraudulently convert the stolen lockbox checks.

In order to convert the stolen lockbox checks, at least one co-conspirator ("CC-1") made mass, unsolicited e-mailings to strangers throughout the U.S., asking the recipients to assist him in completing a purportedly legitimate financial transaction. When an e-mail recipient replied, CC-1 falsely informed the responding recipient that CC-1 was in possession of legitimate funds that he was unable to transfer from his own bank account. CC-1 informed the responding recipient that if the recipient provided his name and address, CC-1 would send him a check. CC-1 instructed the recipient to deposit the check in the recipient's own account, keep a percentage of the deposit amount for himself, and wire the remaining funds to an overseas bank account controlled by CC-1.

Once e-mail recipients agreed to carry out CC-1's instructions, Labbe, CC-1 and others caused the stolen lockbox checks that they had obtained, to be altered in order to permit the

5

e-mail recipients to deposit them. Specifically, Labbe, CC-1 and others removed the original payees' names from the stolen checks and replaced them with the names of participating e-mail recipients.

After the stolen lockbox checks had been altered, Labbe took packages containing the stolen checks to a Federal Express store located in Jamaica, NY, and caused those packages to be delivered by Federal Express to the participating e-mail recipients in other states. At least one of the e-mail recipients contacted by CC-1 deposited a stolen and altered lockbox check into his bank account, and wired the funds to an overseas bank account as instructed.

On December 16, 2005, a government special agent met with the owner of an internet café located in Brooklyn, NY. The owner informed that a West African individual with dread-locks, later identified as Labbe, tried to fax a document to an individual in Nigeria on December 7, 2005. When he was unable to do so, Labbe asked the owner to scan and e-mail the document instead. The owner informed that the document contained a list of individuals and their contact information, as well as dollar amounts. Upon contacting a number of the individuals on the list, the special agent learned that they had responded to a mass e-mail and provided

6

their contact information. The individuals related that they consequently received suspicious checks by Federal Express that they had been asked to deposit; and to then wire a percentage of the proceeds to another bank account.

On that same date, one of the individuals on Labbe's list ("Individual-1") informed the special agent that he had responded to an unsolicited e-mail, provided his contact information to the sender, and received a check ("check-1") by Federal Express that he was asked to deposit and to then wire the proceeds to another bank account. Individual-1 told the special agent that he had not deposited check-1, which was subsequently turned over to a United States Secret Service ("USSS") agent.

On December 23, 2005, the owner of the café provided the special agent with the license plate number of the vehicle that Labbe had previously parked outside the establishment. The special agent subsequently conducted a database search on the license plate number, which revealed that the vehicle belonged to a woman who resided in an apartment complex in Far Rockaway, NY. The special agent then visited the location and learned that the registered owner of the car had previously lived there with Labbe, but had recently moved. Additionally, the building manager informed the

7

special agent that the registered owner of the automobile and Labbe
had moved to an address in Jamaica, NY.

On December 30, 2005, the special agent received a
telephone call from Individual-1, who informed that he had received
another e-mail from the person who had sent him the first check.
Additionally, Individual-1 reported that he received a Federal
express package that contained another check ("check-2"), which he
had been instructed to deposit and to then wire the proceeds to
another bank account. Individual-1 also provided the Federal
Express tracking number for the package that contained check-2.

On that same date, the special agent contacted an
employee of Federal Express and requested information concerning
the tracking number provided by Individual-1. The special agent
learned that the package sent to Individual-1 had been shipped on
December 29, 2005, from the Federal Express store at John F.
Kennedy International Airport in Jamaica, NY. The individual who
sent the package to Individual-1, later identified as Labbe, was
found to have also shipped four other packages on that same date.

The special agent contacted the recipients of three of
the four other packages sent by Labbe from the Federal Express
store on December 29, 2005. All three individuals reported that

8

they had been contacted by mass e-mail and were asked to assist the sender in completing a financial transaction. Additionally, each of these three individuals had all provided their contact information to the sender of the e-mail, and had received checks to deposit, as well as instructions to wire 90 percent of the proceeds to a bank account provided by the sender.

One of the recipients ("Individual-2") provided the special agent with a copy of the check ("check-3") that listed him as the payee and was sent to him through Federal Express. Another USSS agent informed that he had contacted an employee of the payer that was named on the check, and that the employee stated that the payer had originally made check-3 out to a company and not Individual-2. The representative of the payer subsequently reviewed a copy of check-3 and informed the USSS agent that it appeared to be forged.

The special agent subsequently watched a Federal Express surveillance video of Labbe, depicting the defendant filling out shipping forms and sending packages. Labbe matched the description provided by the owner of the internet café of the individual who had asked the owner to fax the list of names and contact information on December 7, 2005.

9

On January 10, 2006, the special agent reviewed check-2, which indicated that it was from "BankBoston Maine" in South Portland, ME, in the amount of $34,358.22. Subsequently, on January 23, 2006, the special agent spoke to an investigator from Bank of America (which merged with BankBoston in 2005), who stated that although the routing number on the check was authentic, the check issuance date for check-2 was not consistent with a valid Bank of America check. The special agent concluded that check-2 was a forged check.

On January 19, 2006, the special agent learned from the Federal Express employee (who had spoken to one of the cashiers at the airport store), that an individual later identified as Labbe, had sent packages from that location almost every weeknight from December 25, 2005, to January 23, 2006.

On January 23, 2006, the special agent and other USSS agents observed Labbe arrive at the Federal Express store with a number of Federal Express envelopes. Another agent observed Labbe through video equipment located in a security room from the back of the store. Labbe subsequently filled out the shipping labels and handed the packages to a Federal Express employee for shipping. After the transaction was complete, Labbe was arrested.

During a search incident to the arrest, law enforcement officers recovered two check stubs of checks that were not in the name of Labbe, a sheet of paper that appeared to be a printed copy of an e-mail containing the names of individuals and dollar amounts, and several scraps of paper with what appeared to be telephone numbers and bank account numbers written on them, including those labeled "Bank of China" and "Commercial Bank of China."

The special agent also recovered shipping label receipts for packages that Labbe attempted to send just prior to his arrest; however, one package, addressed to a recipient in Ontario, Canada, which Labbe had processed with Federal Express on January 23, 2006, was not recovered. The special agent contacted a security officer at Federal Express and requested that the package be intercepted; he was later informed that the package had been intercepted in Canada and was being returned to New York.

According to information provided by the Government, co-conspirator Halley was an employee at the facility where JP Morgan Chase Bank received and sorted lockbox checks, and was responsible for stealing the checks. Additionally, co-conspirator Ellis was one of among several check dealers, who purchased checks from

Halley for distribution. According to the Government, CC-1 remains unidentified to date.

According to the Government, Labbe is responsible for approximately 30 shipments of stolen checks, totaling approximately $7,000,000 at face value. The Government informed that many of the stolen checks were successfully negotiated over the course of the entire conspiracy, resulting in actual losses in excess of $10,000,000; however, the Government cannot accurately estimate how much money Labbe derived from his participation in the offense. Labbe claims to have received only $400 in proceeds from the scheme.

## The Relevant Statutory Provisions

The maximum term of imprisonment for Count I is five years, pursuant to 18 U.S.C. § 371. The maximum term of imprisonment for Count II is ten years, pursuant to 18 U.S.C. § 2314. In addition, pursuant to 18 U.S.C. § 3583(b)(2), if a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years.

Labbe is eligible for not less than one nor more than five years' probation, pursuant to 18 U.S.C. § 3561(c)(1). Because

12

the offense is a felony, pursuant to 18 U.S.C. § 3563(a)(2), one of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service. The maximum fine is $250,000 per count, pursuant to 18 U.S.C. § 3571. A special assessment of $200 is mandatory, pursuant to 18 U.S.C. § 3013(a)(2)(A).

Pursuant to the Violent Crime Control and Law Enforcement Act of 1994, all offenders on probation, parole or supervised release for offenses committed after September 13, 1994, are required to submit to one drug test within fifteen days of commencement of probation, parole, or supervised release, and at least two drug tests thereafter for use of a controlled substance, unless ameliorated or suspended by the Court due to its determination that the defendant poses a low risk of future substance abuse, as provided in 18 U.S.C. §§ 3563(a)(5) and 3583(d).

**The Guidelines**

The November 1, 2007, edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to U.S.S.G. § 1B1.11.

13

Pursuant to U.S.S.G. § 3D1.2(b), Counts I and II are grouped together.

The Guideline for a violation of 18 U.S.C. § 371 is found in U.S.S.G. § 2X1.1, which directs that the guideline for the substantive offense, plus any adjustments, be used. The substantive offense of transportation of stolen goods in interstate commerce is covered under U.S.S.G. § 2B1.1, which provides for a base offense level of six, pursuant to U.S.S.G. § 2B1.1(a)(2).

Because the intended loss reasonably foreseeable to the defendant amounted to more than $7,000,000, based solely on the value of the stolen checks, the base offense level is enhanced 20 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(K).

Because the offense involved more than 50 victims, a four-level increase is warranted, pursuant to U.S.S.G. § 2B1.1(b)(2)(B).

Because the defendant's role in the offense was minimal, he is entitled to a mitigating role decrease of four levels, pursuant to U.S.S.G. § 3B1.2(a).

Based on his plea allocution, Labbe has shown recognition of responsibility for the offense. Pursuant to U.S.S.G. § 3E1.1(a), the offense level is reduced three levels. Therefore, Labbe's adjusted total offense level is 23.

Labbe has four prior criminal convictions.

On May 1, 1998, at approximately 3:08 p.m., inside a Bloomingdales department store located at 1000 Third Avenue, New York, NY, Labbe opened a store charge account using a counterfeit New York State driver's license and a stolen Mastercard which did not belong to him. Additionally, the defendant subsequently charged more than $1,000 worth of store merchandise on the credit card. Labbe pleaded guilty to Possession of a Forged Instrument in the 3rd Degree in Manhattan Criminal Court on August 26, 1998, and was sentenced to three years' probation on October 21, 1998. On April 18, 2002, Labbe was discharged from probation due to a revocation offense and re-sentenced to five months' imprisonment on April 19, 2002. Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2), Labbe receives two criminal history points for this conviction.

Labbe was arrested by the Hanover, NJ Police Department on April 25, 2000, after he and a separately charged individual attempted to use a stolen credit card to purchase $3,063.30 worth

15

of goods at a P.C. Richard & Son retail store in Whippany, NJ. Labbe pleaded guilty to Forgery in the 3rd Degree, Fraudulent Use of a Credit Card in the 3rd Degree, and Attempted Theft by Deception in the 3rd Degree in Morris County Superior Court on May 11, 2000, and, on July 14, 2000, was sentenced to 60 days' imprisonment, three years' probation, and ordered to pay a fine of $405. Pursuant to U.S.S.G. §§ 4A1.1(b) and 4A1.2(e)(2), Labbe receives two criminal history points for this conviction.

On August 18, 2000, at approximately 12:10 a.m., at the corner of Empire Boulevard and Rogers Avenue in Brooklyn, NY, Labbe was found to be operating a motor vehicle with a blood alcohol level above the legal limit. On November 20, 2000, Labbe pleaded guilty to Driving While Alcohol Impaired in Kings County Criminal Court and was sentenced to 15 days' imprisonment or payment of a $350 fine. His sentence was transferred to a conditional discharge, unspecified alcohol treatment and 90 days' suspended license. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), Labbe receives one criminal history point for this conviction.

On March 2, 2002, at approximately 12:50 p.m., at the intersection of Route 878 and Central Avenue in Lawrence, NY, Labbe was observed to be standing near a 1993 BMW with a ringing alarm. Police officers determined that the New York State inspection

16

sticker that was taped to the windshield was forged. On June 20, 2002, Labbe pleaded guilty to Tampering with Public Records in the 2d Degree in Nassau County 1st District Court. He was sentenced to time served and ordered to pay \$120 in court costs. Pursuant to U.S.S.G. §§ 4A1.1(c) and 4A1.2(e)(2), Labbe receives one criminal history point for this conviction.

Thus, Labbe has 6 criminal history points and a Criminal History Category of III.

Based on a total offense level of 23 and a Criminal History Category of III, the Guidelines range for imprisonment is 57 to 71 months.

The Guidelines range for a term of supervised release is at least two but not more than three years, pursuant to U.S.S.G. § 5D1.2(a)(2). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to U.S.S.G. § 5D1.1(a). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to U.S.S.G. § 5D1.1(a).

17

Pursuant to U.S.S.G. § 5B1.1 cmt. 2, Labbe is not eligible for probation because the applicable Guidelines range is in Zone D of the Sentencing Table.

The Guidelines fine range for the instant offense is from $10,000 to $100,000, pursuant to U.S.S.G. § 5E1.2(c)(3). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release, pursuant to U.S.S.G. § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,036.92 to be used for imprisonment, a monthly cost of $294.60 for supervision, and a monthly cost of $1,799.04 for community confinement.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) in order to impose a sentence "sufficient, but not greater than necessary," as is required in accordance with the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

18

Having considered all of the factors set forth in §3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

**The Sentence**

For the instant offense, Labbe is hereby sentenced to a term of 57 months' imprisonment and a term of supervised release of three years. Labbe shall forfeit to the United States his interest in any proceeds of the conspiracy, including $44,000,000 in U.S. currency and U.S. Postal Service money orders totaling approximately $25,000. Labbe is further ordered to pay a mandatory special assessment of $200, which shall be due to the United States immediately.

Labbe shall also be ordered to pay restitution to the victims of the conspiracy. Pursuant to 18 U.S.C. § 3664(d)(5), the Government shall provide the Court with full information regarding the victims and their losses and the Court shall make a final determination of restitution not more than 90 days from the date of sentencing.

As mandatory conditions of his period of supervised release, Labbe shall:

(1) not commit another federal, state or local crime;

(2) not illegally possess a controlled substance;

(3) not possess a firearm or destructive device;

(4) cooperate in the collection of DNA as directed by the probation officer; and

(5) submit to one drug test within 15 days of release and two periodic drug tests thereafter for use of a controlled substance.

The Defendant will comply with the standard conditions of supervision (1-13), as set forth in the judgment, along with the following special conditions:

(1) The defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer. The defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of the third-party payment.

(2) The defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include urine testing at the direction and discretion of the probation officer.

(3) The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. The Defendant

20

shall inform any other residents that the premises may be subject to search pursuant to this condition.

(4) The defendant shall provide the probation officer with access to any requested financial information.

(5) The defendant shall obey the immigration laws and comply with the directives of immigration authorities.

Labbe is therefore directed to report to the nearest Probation Office within 72 hours of release. It is recommended that Labbe be supervised by the district of his residence.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the defendant is able to pay a fine, so the fine in this case shall be waived.

The terms of this sentence are subject to modification at the sentencing hearing set for January 29, 2008.

It is so ordered.

**New York, NY**
**January 23 , 2008**

**ROBERT W. SWEET**
**U.S.D.J.**

21